UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                          :
JOHN B. MAIA                              :          3:15 CV 584 (JGM)
                                          :
V.                                        :
                                          :
CAROLYN W. COLVIN,                        :
ACTING COMMISSIONER OF                    :
SOCIAL SECURITY                           :
                                          :          DATE: FEBRUARY 23, 2017
------------------------------------------------------ x
```

RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].[1]

I.  ADMINISTRATIVE PROCEEDINGS

On September 28, 2011, plaintiff filed an application for DIB benefits claiming that

he has been disabled since September 1, 2009 (see Tr. 209-15), due to chronic back

problems, high blood pressure and high cholesterol. (Certified Transcript of Administrative

Proceedings, dated June 13, 2015  ["Tr."] 77, 87, 274; see Tr. 286).  Plaintiff's application

was denied initially and upon reconsideration (Tr. 107-14; see Tr. 86, 96), and on May 30,

2012, plaintiff filed his request for a hearing before an Administrative Law Judge ["ALJ"].

(Tr. 115-18; see Tr. 119-26, 151-52).  A hearing was held on September 3, 2013, before ALJ

James E. Thomas, at which plaintiff and vocational expert Hank Lerner testified.  (Tr. 38-76;

_____

[1]On September 28, 2011, plaintiff applied for Supplemental Security Income benefits but
his application was denied based on his income  (Tr. 97-106, 202-08); the denial of this application
is not the subject of this pending action.

At the time plaintiff applied for DIB, he was receiving Workers' Compensation benefits.
(Tr. 216-27, 229-61).  Plaintiff had been receiving such benefits since December 2000.  (Tr. 261).

see Tr. 156-201).  Plaintiff has been represented by counsel.  (Tr. 137-41).  On September

25, 2013, ALJ Thomas issued his decision finding that plaintiff has not been under a disability

from September 1, 2009 through the date of his decision.  (Tr. 11-21).  On November 22,

2013, plaintiff filed his request for review of the hearing decision (Tr. 26; see also Tr. 27-37),

and on February 19, 2015, the Appeals Council denied plaintiff's request for review, thereby

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).

On April 20, 2015, plaintiff filed his complaint in this pending action.  (Dkt. #1).[2]  On

June 18, 2015, defendant filed her answer, along with a copy of the administrative record,

dated June 13, 2015.[3]  (Dkts. ##10, 13, 21).  Thereafter, on August 14, 2015, plaintiff filed

his Motion to Reverse the Decision of the Commissioner, with brief in support and a

stipulation of facts (Dkt. #14), and on November 13, 2015, defendant filed her Motion to

Affirm, with brief in support.  (Dkt. #19).  On January 6, 2016, the parties consented to this

Magistrate Judge's jurisdiction and the case was transferred accordingly.  (Dkt. #20).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the

Commissioner (Dkt. #14) is granted such that the matter is remanded for further

proceedings consistent with this Ruling, and defendant's Motion to Affirm the Decision of the

Commissioner (Dkt. #19) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff is single, with one minor child, who is with him every other weekend.  (Tr.

43, 60; see also Tr. 277 (lives alone), 304 (lives with girlfriend)).  He lives in a house (Tr. 43,

---

[2]On the same day, plaintiff filed a Motion to Proceed In Forma Pauperis (Dkt. #2), which motion was granted two days later. (Dkt. #6).

[3]There is a fair amount of duplication in the record.

277, 304), and he spends "a lot of time in bed, just laying down."  (Tr. 58; <u>see</u> Tr. 277, 304).

He watches television, plays cards, and does some household cleaning, but he needs

assistance to plug in a vacuum, and he must drag his laundry bag.  (Tr. 58-59, 281-82, 308;

<u>see</u> Tr. 278, 280, 307).  He has to slip on his shoes, and he lays on his back to put on his

socks, or he has someone else do it for him.  (Tr. 61; <u>see</u> Tr. 278).   When he is with his

daughter, he takes her to see his family, but after being out, or after "too much activity, too

much movement[,]" he "may spend one to two to three days just in bed[.]" (Tr. 60-61; <u>see</u>

Tr. 277, 282, 304, 309).  Plaintiff describes his days when he is bed-ridden as "some of the

worst days."  (Tr. 61).

Plaintiff has a high school education (Tr. 41, 43), and held a job as a supervisor at

the Southbury Training School for fifteen years.  (Tr. 44; <u>see</u> Tr. 320, 327).  He supervised

between ten and twenty-one staff members.  (<u>Id.</u>; <u>see</u> Tr. 288). He was responsible for

taking disciplinary action over his staff, and he was physically involved with the care of

patients.  (Tr. 45-46; <u>see</u> Tr. 288).

Plaintiff testified that he injured his lower back in 2000, and had to stop working in

September 2009 because he "couldn't do [his] job. . . . [He] couldn't even drive to [his] job,

and even if [he] did, [he] couldn't stay there . . . [because he] was just experiencing too

much pain."  (Tr. 46-47).  His pain radiates down his right buttocks (Tr. 48-49), and it is

aggravated by too much movement, or sitting, lying or walking for too long.  (Tr. 49-50).

He rated his back pain as a seven or eight on a scale to ten, and he takes pain medication,

including Percocet, Morphine Sulfate, Oxycodone, and Celebrex (Tr. 48, 63, 279, 306, 316,

325),[4]  but, according to plaintiff, the pain medications do not help.  (Tr. 48).  He has seen

_____

[4]Plaintiff also reported that he takes or has taken aspirin, Bupriopion SR, Cardizem,
Hydrochlorothiazide, Lipitor/Atorvastatin, Lyrica, Spironolactone, vitamin D, Voltaren,

a pain management specialist since 2009 for injections, or to refill his medications; the injections only help him for one to three weeks at best.  (Tr. 50-52).   Physical therapy "aggravates [his] back too much[]" (Tr. 52); he has been prescribed a cane, but he does not use one because it is "easier for [him] to not use it[]" (Tr. 49; <u>see</u> Tr. 283); and he has been prescribed a back brace and a TENS unit but neither help.  (Tr. 52-53; <u>see</u> Tr. 283).   He has been prescribed Ambien to help him sleep but his back pain keeps him awake, so he sleeps only three to five hours at night.  (Tr. 53-54; <u>see</u> Tr. 278, 306).

In addition to his back pain, plaintiff was diagnosed with a left partial subscapularis tear in his shoulder that is painful and limits his ability to lift overhead with his left arm.  (Tr. 54-55).  He does physical therapy for his shoulder, which he said helps, but he is still limited in his ability to lift more than five or ten pounds.  (Tr. 55).  Plaintiff testified that he cannot even lift a gallon of milk, and he must hold on to a cart when he grocery shops.  (Tr. 55-56).

Plaintiff testified that he needs to rest every twenty minutes, can stand for about fifteen minutes, and can sit for fifteen to twenty minutes before he needs to move because of the pain.  (Tr. 56-57; <u>see</u> Tr. 283, 310).   Plaintiff also testified that he loses his balance sometimes, he cannot stoop or crouch, and if he kneels, he needs something to hold on to so that he can lift himself up. (Tr. 57-58).   According to plaintiff, his back impairment affects his ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs.  (Tr. 282; <u>see also</u> Tr. 309).

The vocational expert testified that plaintiff could not perform his past work (Tr. 65), but he could perform the work of a case aide, an assembler, and a cashier.  (Tr. 66).  If an individual was limited to sedentary work, such person could still perform the work of a

---

Zolpidem/Ambien, Lorzone, Matzim, and Diovan.  (Tr. 289, 300, 306, 316, 325-26).

telephone solicitor, a food checker, or an appointment clerk.  (Tr. 67-68).  According to the vocational expert, the telephone solicitor and the food checker position allow for a sit/stand option.  (Tr. 70-71).  Additionally, these positions would not be affected by a limitation prohibiting crouching.  (Tr. 74-75).  The vocational expert also testified that if such an individual was off-task fifteen percent or more of the time, or absent twice a month, that individual would be unable to sustain employment.  (Tr. 68).  The vocational expert opined that anyone who is off production fifty percent of the time would not be able to perform employment.  (Tr. 70).

B. MEDICAL RECORDS[5]

1. LUMBAR SPINE

In November 2000, while working at Southbury Training School, plaintiff was "kicked in the back by a resident[,]" which incident caused him to be out of work with "severe S1 radiculopathy."  (Tr. 526-27; see Tr. 517).  Prior to his alleged onset date of disability, plaintiff underwent two back surgeries under the care of Dr. Michael E. Karnasiewicz, of Neurosurgery Associates of Northwest Connecticut, P.C. -- a discectomy at L5-S1 in 2001, and a fusion at L5-S1 in 2005.  (Tr. 654-62; see also Tr. 63 (out of work while he was "rehabbing"), 324, 517, 526-29, 530).[6] Prior to his first surgery, plaintiff was "fearful and wish[ed] to pursue further conservative management."  (Tr. 527).  Following his surgeries,

---

[5]The following recitation is taken from the parties' Joint Stipulation. (Dkt. #14-2). The Court has reviewed the entire administrative transcript, but refers to the relevant entries as recited below. (But see generally Tr. 359-69, 374-86, 390-92, 393-97, 431-42 (records from plaintiff's primary care physician, Dr. George Barchini, from May 2009 through August 2011 for hematuria, hypertension, sleep apnea, and additional records related thereto); 443-44 (record of heart murmur); 450-60, 463, 469-82, 663-69, 681-83 (hematuria)).

[6]Plaintiff testified at his hearing that a third surgery has been recommended but he is "afraid" to have another surgery. (Tr. 47, 50).

Dr. Karnasiewicz assigned plaintiff a twenty-five percent disability rating for his lumbar spine. (Tr. 530).

On September 16, 2008, Dr. Karnasiewicz treated plaintiff for low back and lower extremity pain. (Tr. 530-31). Plaintiff reported working until two weeks prior to that appointment date, but that he stopped due to "his severe pain." (Tr. 530). Upon examination, plaintiff looked "somewhat uncomfortable[,]" and the "[r]ange of motion of his back [was] significantly restricted." (Tr. 531). Negative findings included left-sided straight leg testing, intact reflexes and no numbness or weakness in his lower extremities. (Id.). Dr. Karnasiewicz sent him for diagnostic testing, and he ordered him to "stay out of work until we get to the root of this problem and are able to treat it." (Id.).

On May 7, 2009, plaintiff was seen by Dr. Karnasiewicz; he reported "some response from lumbar traction[]" that consisted of "several days of significant relief . . . ." (Tr. 519, 532). Upon examination, Dr. Karnasiewicz noted that plaintiff walked "slowly and stiffly[]" and his range of motion was restricted. (Id.). Dr. Karnasiewicz recommended continued traction and ordered a lumbar corset; he found his patient totally temporarily disabled. (Id.).

On June 23, 2009, plaintiff reported to Dr. Karnasiewicz "quite a bit of improvement." (Id.). Upon examination, plaintiff had increased spine movements and a negative straight leg raise test. (Id.). Plaintiff requested to return to work without restrictions on July 1, 2009. (Id.).[7]

---

[7]Plaintiff attended physical therapy at React Physical Therapy from June 2009 through February 2010. (Tr. 605-53). Treatment included physical therapy, traction, and aquatic therapy. (Id.). On October 20, 2009, the therapists noted that plaintiff was still working full-time (Tr. 608), and on November 5, 2009, he reported that he had "not been able to go to work for the past two days." (Tr. 616). He had a negative straight leg raise test in the supine position and positive straight leg raise test in the sitting position on the left in some visits. (Tr. 610). Plaintiff complained of low back pain throughout the program. (Tr. 605-53). Upon discharge, he was noted to have improved ambulatory tolerance; to have continued varying degrees of bilateral low back

On October 1, 2009, Dr. Karnasiewicz noted that plaintiff was doing "relatively well, although he ha[d] some aching in his low back[,]" his condition was "livable[,]" and he was "able to work."  (Tr. 520).  Upon examination, Dr. Karnasiewicz noted "some stiffness and decreased range of motion." (Id.).  Plaintiff's straight leg raise test was negative, and he had normal strength and sensation in the lower extremities. (Id.).

On November 6, 2009, plaintiff returned to PA-C Chan Chu of Dr. Karnasiewicz's office with complaints of "severe low back pain" that left him "unable to sit." (Tr.  349, 521, 533). Plaintiff was "able to flex his foot, but with severe pain[.]"  (Id.).  PA-C Chu found him to be in "extreme distress." (Id.).  PA-C Chu also noted SI joint tenderness, "severely limited[]" range of motion in the back, and altered gait. (Id.). Plaintiff's strength in the left lower extremity was 4/5 and his strength in the right lower extremity was 3/5. (Id.).  His sensation was "equal and intact[]" in the bilateral lower extremities. (Id.).  Plaintiff was referred to physical therapy, he was ordered to get an additional MRI scan, and he was given a prescription for Dilaudid. (Id.).

Three days later, on November 9, 2009, plaintiff underwent an MRI, the results of which revealed the following: "[s]tatus post posterolateral and anterior fusion at L5-S1" with "mild right neural foraminal narrowing at this level[]"; "L4-L5 spondylosis with slightly increased moderate central canal narrowing" with "moderate left greater than right neural foraminal narrowing at this level[]"; and "[m]ild progression in mixed intensity endplate signal changes at L4-L5, with mild associated enhancement, probably degenerative/reactive rather than infectious[.]" (Tr. 524-25, 541-42).  Plaintiff returned to Dr. Karnasiewicz the

---

pain, buttocks and intermittent bilateral lower extremity paresthesia; to have poor trunk stability; and to have severe pain with transitional movement. (Tr. 653).  He was discharged while awaiting authorization for an epidural steroid injection. (Id.).

next day. (Tr. 521, 533, 535).   Dr. Karnasiewicz noted "increasing stenosis at L4-5" and an increasing size of his disc herniation. (Id.).   Upon examination, the doctor found plaintiff to be in "terrible pain[,]" and he noted that he "walked slowly and stiffly." (Id.).   Dr. Karnasiewicz found that a "[s]light range of motion causes severe back pain[,]" noting also that plaintiff was "not doing well." (Tr.  521-22, 533, 535).  Dr. Karnasiewicz opined that "surgery is probably inevitable," but that plaintiff had made the reasonable request to hold off. (Tr. 522, 535).  Dr. Karnasiewicz recommended that plaintiff continue physical therapy, he prescribed Dilaudid, and he noted that prompt surgery could be a possibility; he kept plaintiff out of work. (Id.).  Plaintiff returned to Dr. Karnasiewicz on December 14, 2009; he was still "not doing well[,]" with "back pain, bilateral buttock pain, and occasional radiating right leg pain."  (Id.).

On January 25, 2010, plaintiff was seen again by Dr. Karnasiewicz, with positive straight leg raise testing bilaterally.  (Tr. 523, 536).  He was "not doing well." (Id.).  Plaintiff expressed his "wish[] to try everything humanly possible to avoid an operation."  (Id.).  On July 2, 2010, plaintiff returned to Dr. Karnasiewicz; again, plaintiff was "not doing well[]" with back pain, buttock pain, and occasional leg pain. (Id.).  Plaintiff described transient relief from epidural steroid injections and requested surgery as they "tried conservative therapy, and it is not working."  (Id.). Plaintiff "walk[ed] with great difficulty[,]" hyperextension caused a "marked increase in symptoms[,]" and plaintiff had a positive bilateral straight leg raise test. (Id.). Dr. Karnasiewicz proposed a decompression and fusion of the L4-5 discs at this time; he also explained that continued conservative management with pain endurance was an option. (Id.).[8]

_____

[8]On April 12 and August 12, 2010, plaintiff was seen by his primary care physician for routine follow-up visits.  (Tr. 352-57); see note 5 supra.

On August 2, 2010, plaintiff was seen by Dr. Glenn Taylor of Neurosurgery, Orthopaedics & Spine Specialists, PC, upon the request of Dr. Karnasiewicz. (Tr. 464-65). Dr. Taylor noted that plaintiff reported "a degree[]" of help from the three epidural steroid injections, but overall he had continued back pain that was "excruciating[]" from time to time, and that radiated into the right buttock. (Tr. 464). Dr. Taylor read plaintiff's November 2009 MRI scan to show "clear degenerative spinal stenosis at L4-L5 above his previously performed fusion with disc space degeneration and modic changes within the end places of L4-L5." (Id.). On examination, plaintiff appeared "uncomfortable as he move[d] about the examining room" with a limited range of motion due to pain. (Id.). He had "normal strength in his lower extremities." (Id.). Dr. Taylor diagnosed plaintiff with "[l]umbar spinal stenosis at L4-5 moderately severe in degree with disc degeneration, i.e. adjacent level syndrome above a previously performed fusion." (Tr. 465). He concurred with Dr. Karnasiewicz that a fusion at L4-L5 level with a discectomy would be a "reasonable" course, although he admitted that he "cannot guarantee that all of his pain will be relieved[]" and that it "could result in more proximal adjacent level problems[]" with "no long term evidence that such a procedure will diminish or prevent . . ." such issues. (Id.). Dr. Taylor considered a trial injection to be a "low risk procedure." (Id.).

On September 17, 2010, plaintiff presented to Dr. Bhavesh Patel of Interventional Spine and Sports Medicine, for a consultation under his Workers' Compensation claim. (Tr. 591-92). Dr. Patel noted back and right buttock pain made worse by prolonged sitting, standing, walking, rising from sitting, bending forward or backward, laying on the stomach, driving, coughing or sneezing. (Tr. 591). Plaintiff denied any leg weakness or numbness. (Id.). Upon examination, Dr. Patel noted a slow antalgic gait, restricted lumbar spine motion

9

to forty degrees, and diminished reflexes (1+/4). (Id.). Plaintiff was otherwise neurologically normal, and he had a negative straight leg raise test with full strength in the lower extremities. (Tr. 591-92).   The doctor diagnosed plaintiff with mechanical low back pain, lumbar stenosis, and right L4-L5 radiculitis. (Tr. 592).   Dr. Patel recommended future injections. (Id.).

Plaintiff returned to Dr. Patel on October 13, 2010 (Tr. 461-62, 588-90);[9] he reported continued back and bilateral leg pain, as well as bilateral leg numbness. (Tr. 462, 588). Plaintiff requested additional injections in an effort to avoid further surgical correction. (Id.). On exam, Dr. Patel noted the following positive findings: lumbar range of motion restricted to thirty degrees with pain and 1+/4 reflexes at the bilateral patellae and Achilles tendon. (Tr. 461, 589).   Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait, and was otherwise neurologically intact. (Id.).   Dr. Patel reiterated previous diagnoses, the two agreed to pursue bilateral L4-L5 transforaminal epidural steroid injections, and Dr. Patel renewed the Oxycodone prescriptions and added Lyrica. (Tr. 461, 490, 589).

On November 30, 2010, plaintiff received bilateral L4-L5 transforaminal epidural steroid injections with Dr. Patel. (Tr. 603).   During his next visit with Dr. Patel on December 20, 2010 (Tr. 446-49, 586-87), plaintiff told his doctor that "the pain was much better for the first week[]" following his injections. (Tr. 446, 448, 586).   However, "the second week the pain returned" and it was not relieved by pain medication. (Id.).   Dr. Patel noted that plaintiff's lumbar range of motion was restricted to forty degrees with pain. (Id.).   Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait,

---

[9]The record is dated October 13, 2010, but signed March 31, 2011. (Tr. 590).

intact reflexes, and was neurologically intact. (Id.). Dr. Patel reaffirmed his previous diagnoses, and opted to move forward with further injections, stating that his patient "wishes to avoid surgery at this point." (Tr. 446, 448, 587).  Percocet was discontinued, and Fentanyl patches were prescribed by Dr. Patel (Tr. 447, 449, 587), and on January 25, 2011, Dr. Patel administered another bilateral transforaminal epidural spinal nerve block injection at L4.  (Tr. 514, 602).

On February 16, 2011, plaintiff was seen by Dr. George Barchini, an internist (Tr. 362-66), who noted tenderness to palpation in the back, flat feet, and plaintiff's inability to flex his spine due to lower back pain. (Tr. 365).  Plaintiff returned to Dr. Patel two days later, on February 18, 2011 (Tr. 509-10, 584-85); he reported that his pain was "somewhat improved post [the injection] procedure." (Tr. 509, 584). Plaintiff, however, reported that his leg pain still bothered him and that he was having trouble sleeping at night. (Id.).  Dr. Patel continued to prescribe Percocet, and he noted that plaintiff "continue[d] to be limited." (Tr. 509, 585).

On March 14, 2011, plaintiff reported to Dr. Patel that his back pain was "persistent and [was] getting [a] little bit worse[,]" with "mild relief[]" from his Percocet medication and "minimal relief[]" from Neurontin. (Tr. 507-08, 582-83). Again, Dr. Patel noted that plaintiff's lumbar spine range of motion flexion was limited to forty degrees "with extension with pain bilaterally[.]" (Tr. 507, 583).  Plaintiff had full strength in the lower extremities, an intact gait, normal reflexes, negative straight leg raise test, and he was otherwise neurologically intact. (Id.). Dr. Patel renewed Percocet, increased Neurontin, and started Celebrex. (Tr. 507, 583).

On April 14, 2011, plaintiff saw Dr. Patel's PA, Nicole Havel (Tr. 425-26, 505-06, 580-

81); he reported continued medication use, though he stopped taking Neurontin due to non-effectiveness. (Tr. 425, 505, 580).  Plaintiff had "pain across the low back [but] no leg component at this time." (Id.).   PA Havel diagnosed plaintiff with mechanical back pain, status post L5-S1 fusion, and lumbar stenosis, and she noted that he "does have difficulty getting on to and off of the exam table due to pain." (Tr. 425, 505, 581).  PA Havel was pursuing a bilateral transforaminal injection with sedation for plaintiff, and she continued other medications while increasing the dose of Neurontin. (Tr. 425-26, 505-06, 581).  She signed a certificate for "permanent disability . . . [for]  handicap parking" from the Department of Motor Vehicles, and she held plaintiff out of work. (Tr.  426, 506, 581).

On April 23, 2011, plaintiff was seen at Kingston Hospital for complaints of head and neck pain following a motor vehicle accident. (Tr. 420-23).  On examination, plaintiff was "in mild painful distress[,]" and he had positive paravertebral tenderness; the exam did not show any lumbar tenderness or extremity tenderness/range of motion issues. (Tr. 421). He had full strength throughout his extremities. (Id.).

Plaintiff received transforaminal epidural steroid injections bilaterally at L3 and L4 on May 10, 2011 with Dr. Patel. (Tr. 513, 601). On May 24, 2011, plaintiff reported to PA Havel that he had some improvement of his pain (fifteen to twenty percent), although he still experienced back pain that radiated into his lower extremities. (Tr. 418-19, 503-04, 578-79). Plaintiff had little relief with his TENS unit, and he was kept out of work. (Tr. 418, 503, 578). PA Havel noted that plaintiff's lumbar spine range of motion flexion continued to be limited to forty degrees "with painful extension and bilateral lateral rotation . . ." and "[m]oderate tenderness with palpation to the bilateral quadratus lumborum . . . and the right SI joint." (Tr. 418, 503, 579). PA Havel diagnosed plaintiff with mechanical back pain, status post L5-

S1 fusion, and lumbar stenosis. (Id.). She increased plaintiff's Celebrex and provided plaintiff with a note that "keeps him on out of work status effective today until his follow up appointment post injection[]"; she referred plaintiff to Dr. Karnasiewicz for surgical options. (Tr. 419, 504, 579). PA Havel noted that Dr. Patel also saw the patient and agreed with the treatment plan and recommendations. (Id.).

Plaintiff received right L3 and L4 paramedian epidural interlaminar spinal nerve block injections with Dr. Patel on June 7, 2011. (Tr. 512, 600). On June 23, 2011, plaintiff followed-up with PA Havel; he felt "slight improvement" following his injections, "maybe [fifteen percent] overall." (Tr. 410-11, 501-02, 576-77). Plaintiff had increased pain with walking, sitting, or standing too long. (Tr. 410, 501, 576). He "continue[d] to remain on an out-of-work status." (Id.). Plaintiff's lumbar spine range of motion flexion was limited to forty degrees "with painful extension and bilateral lateral rotation . . ." and "[m]oderate tenderness with palpation to the bilateral quadratus lumborum . . . and the right SI joint." (Id.). Plaintiff had full strength in the lower extremities, an intact gait, normal reflexes, negative straight leg raise test, and he was neurologically intact. (Id.). PA Havel diagnosed plaintiff with mechanical back pain, status post L5-S1 fusion, and lumbar stenosis. (Tr. 410, 501, 577). She prescribed a mobile TENS unit and a lumbar support for plaintiff, and she made an additional referral for him to see Dr. Karnasiewicz. (Tr. 410-11, 502, 577). She also noted that Dr. Patel was involved in all decisions. (Tr. 411, 502, 577).

On July 14, 2011, plaintiff returned to Dr. Karnasiewicz for a consultation. (Tr. 517-18, 537-38). At the time, plaintiff complained of bilateral lower back pain that radiated into the bilateral buttocks. (Tr. 517, 537). Dr. Karnasiewicz noted that plaintiff "ambulates with a limp and lo[]ses his balance with ambulation." (Id.). Plaintiff reported to Dr. Karnasiewicz

that "injections do help for a few weeks, but nothing lasting more than a month." (Id.). On examination, Dr. Karnasiewicz noted that plaintiff walked with difficulty, had a "stiff and straight[]" back, and had a "markedly restricted" hyperextension/flexion and positive straight leg test. (Tr. 518, 538). Plaintiff had symmetrical reflexes and "no fixed numbness[,]" and he denied any leg pain or weakness. (Id.). He diagnosed plaintiff with degenerative disc disease and spinal stenosis at L4-5, one level above his fusion. (Id.). Plaintiff expressed a desire to avoid surgery, and he opted for continued injections and possibly acupuncture. (Id.).

On July 21, 2011, plaintiff returned to Dr. Patel who noted a recently-prescribed back brace that gave plaintiff relief. (Tr. 405-06, 499-500, 574-75). Dr. Patel asked plaintiff "to take [his medication] more frequently as this will help decrease his pain and help decrease his leg pain." (Tr. 405, 499, 574). Dr. Patel noted again that plaintiff's lumbar spine range of motion has restricted forward flexion to forty degrees "with painful extension and bilateral lateral rotation . . . ." (Id.). Dr. Patel diagnosed plaintiff with mechanical back pain, status post L5-S1 fusion, and lumbar stenosis, and he continued Neurontin, Celebrex, and Percocet. (Id.).

On August 4, 2011, plaintiff was seen by Dr. Mark Mashia, a chiropractor with Dr. Karnasiewicz's practice. (Tr. 402-03). Dr. Mashia noted that "a second surgical fusion has been recommended at the level of L4-L5, but [that plaintiff] wishes to hold off on this procedure[,]" and that a trial of acupuncture had been recommended for this reason. (Tr. 403). At the time, plaintiff "complain[ed] of unrelenting pain and stiffness across the lower back[]" that "radiat[ed] into both lower extremities" and that was "bothered by any prolonged standing, sitting, or repetitive bending." (Id.). On exam, Dr. Mashia noted that

14

plaintiff had "clear[]" discomfort at rest; "slow and cautious gait[,]" lumbar flexion limited to twenty-five degrees and extension to ten degrees due to pain and spasm; limited lateral movements to fifteen degrees; diffuse muscle guarding and spasms in the lower back; palpation tenderness; and incision tenderness. (Tr. 402).   Dr. Mashia offered acupuncture treatment as appropriate, and plaintiff agreed to pursue the same. (Id.).

On September 8, 2011, plaintiff returned to Dr. Patel where he "continue[d] to describe low back pain and bilateral leg pain and numbness." (Tr. 400-01, 497-98, 572-73). Dr. Patel commented that his patient "continue[d] to be suffering" and he requested "to discuss other options of improving his pain." (Tr. 400, 497, 572).   Dr. Patel diagnosed plaintiff with mechanical back pain, status post L5-S1 fusion, and lumbar stenosis. (Id.).   He changed plaintiff's medication from Percocet to MS Contin.   (Id.).   Approximately one week later, on September 16, 2011, plaintiff returned to Dr. Patel (Tr. 398-99, 495-96, 570-71); at that time he had "no change in his symptoms and in fact he [felt] that the pain [was] worse." (Tr. 398, 495, 570).   On exam, Dr. Patel noted lumbar spine range of motion flexion limited to forty degrees "with painful extension and bilateral lateral rotation . . ." and "[m]oderate tenderness with palpation to the bilateral quadratus lumborum . . . and the right SI joint." (Id.).   Dr. Patel diagnosed plaintiff with mechanical back pain, status post L5-S1 fusion, and lumbar stenosis. (Id.).   Dr. Patel discontinued MS Contin; he restarted Percocet and initiated Lyrica "to help decrease pain and help restore sleep." (Id.).

On October 14, 2011, plaintiff was seen by PA Havel (Tr. 493-94, 567-69) who noted "very short term[]" and "not very much overall" relief with the new TENS unit, as well as continued sleep interruption.   (Tr. 493, 567).   Plaintiff reported receiving acupuncture with little relief. (Id.).   He requested an injection and complained of "pain across the low back

with radiation into the groin and both hips as well as the anterior thighs bilaterally." (Id.). Plaintiff's lumbar spine range of motion flexion was limited and he had moderate tenderness to palpation. (Id.). PA Havel renewed prescriptions for Percocet and Amrix. (Tr. 494, 568). PA Havel noted that Dr. Patel saw the patient as well and agreed with the treatment plan. (Id.).

Plaintiff received bilateral transforaminal epidural steroid injections at L4 on October 25, 2011. (Tr. 511, 599).  On November 15, 2011, plaintiff returned to PA Havel where he reported a "[twenty percent] reduction in . . . pain" since his October 25, 2011 injection. (Tr. 491-92, 565-66). Plaintiff continued to complain of "pain across the low back with radiation down both legs[]" and he was "finding little relief from . . . medication." (Tr. 491, 565).  PA Havel noted that plaintiff's lumbar spine range of motion flexion was limited to forty degrees "with painful extension and bilateral lateral rotation . . ." and "[m]oderate tenderness to palpation at the bilateral quadratus lumborum, right greater than left[.]" (Id.).  Plaintiff had full strength in the lower extremities, an intact gait, normal reflexes, bilateral negative straight leg raise test, and he was otherwise neurologically intact. (Id.).  She prescribed Percocet and Lorzone, and noted that Dr. Patel had seen the patient and agreed with the treatment. (Tr. 491-92, 566).  Plaintiff returned to Dr. Patel a month later, on December 14, 2011, with complaints of worsening pain and no improvement from Lorzone. (Tr. 489-90, 563-64).  He ordered continued Percocet use and added Diclofenac. (Tr.  490, 564).

Plaintiff was seen by PA Havel on January 13, 2012 (Tr. 487-88, 561-62); he reported that his pain medication regimen would "take the edge off, but . . . not take his pain away." (Tr.  487, 561).  He also reported sleeping difficulties. (Id.).  On exam, PA Havel noted again the limitations in plaintiff's lumbar spine range of motion.  (Id.).  PA Havel continued

plaintiff's home exercise program and prescribed pain medications and sleeping medications. (Tr. 488, 562).  Dr. Patel had also seen plaintiff and noted his agreement with the treatment plan. (Id.).

On February 13, 2012, plaintiff returned to Dr. Patel (Tr. 485-86, 559-60) with continued complaints of back pain that radiated into his bilateral lower extremities along with difficulty sleeping; he reported a lack of success with his newer medications. (Tr. 485, 559). Dr. Patel prescribed a new sleep medication and suggested that plaintiff could receive additional injections in the future.  (Tr. 486, 560). On March 12, 2012, plaintiff complained to Dr. Patel of back pain and difficulty sleeping. (Tr. 557-58).   Dr. Patel continued to prescribe Percocet. (Tr. 557).

A month later, on April 12, 2012, plaintiff returned to Dr. Patel with complaints of back and bilateral leg pain, this time "ready to consider injections as his pain [was] worsening." (Tr. 555-56). Dr. Patel continued plaintiff's Percocet medication regime and recommended an L3 transforaminal epidural steroid injection. (Tr. 555).

Plaintiff was seen by Dr. Patel on May 14, 2012, for his continued back pain and bilateral leg pain that was causing difficulty sleeping and was unrelieved by his Percocet medication.  (Tr. 554).  On exam, Dr. Patel noted that plaintiff's lumbar spine range of motion flexion was limited to forty degrees with painful extension and bilateral lateral rotation. (Id.).  Dr. Patel reiterated his previous diagnoses and continued plaintiff's dual prescriptions for Percocet and Ambien, and he referred plaintiff back to Dr. Karnasiewicz at plaintiff's request. (Id.).

On June 11, 2012, plaintiff saw another PA with Dr. Patel, PA-C John Sceppa with complaints of lower back pain and bilateral lower extremity pain.  (Tr. 553).  At that time,

they continued to wait for authorization for a transforaminal epidural steroid injection; plaintiff's Percocet prescription was refilled. (Id.).  PA-C Sceppa noted that Dr. Patel saw the patient and agreed with this course of care. (Id.).

On July 9, 2012, plaintiff returned to PA-C Sceppa (Tr. 551-52); at the time, plaintiff complained of lower back pain and bilateral lower extremity pain. (Tr. 551).  PA-C Sceppa explained the transforaminal injection process to plaintiff, referred his patient to Dr. Karnasiewicz, and refilled his dual prescriptions for Percocet and Ambien medications. (Id.). PA-C Sceppa noted that Dr. Patel also saw the patient and agreed with this course of care (Tr. 552), and on this date, Dr. Patel held plaintiff out of work. (Tr. 716).

On July 24, 2012, plaintiff underwent a bilateral L3 transforaminal epidural steroid injection with Dr. Patel. (Tr. 597-98, 670-71).  Six days later, on July 30, 2012, plaintiff returned to Dr. Karnasiewicz. (Tr. 515-16, 539-40).  At the time, plaintiff complained of low back pain that radiated into his right proximal buttock, which was aggravated by sitting, standing, and walking. (Tr. 515, 539).  On examination, Dr. Karnasiewicz noted a "loss of the normal lumbar lordosis[,]" back pain with flexion and hyperextension, and positive straight leg raise testing bilaterally. (Tr. 516, 540).  Plaintiff had no weakness or fixed numbness in the lower extremities. (Id.). Dr. Karnasiewicz diagnosed plaintiff with "transitional-level syndrome at L4-5 and spinal stenosis at L4-5" that had "probably progressed." (Id.). Dr. Karnasiewicz opined that plaintiff "is permanently disabled from his job at Southbury Training School[,]" and that it was "probable that he has a sedentary work capacity." (Id.).

On August 7, 2012, plaintiff saw PA-C Sceppa to whom he reported "approximately [ten] to [twenty percent] improvement" in his symptoms of back and lower extremity pain following the July 24, 2012 transforaminal injection. (Tr. 549-50).  Plaintiff still required the

use of his pain medication, although he had experimented with not taking it "to see how he felt . . . ." (Tr. 549). PA-C Sceppa noted that plaintiff's lumbar spine range of motion flexion continued to be limited to forty degrees with painful extension and bilateral lateral rotation. (Id.).  Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait, intact reflexes, and was otherwise neurologically intact. (Id.).   He recommended a repeat bilateral L3 transforaminal injection procedure, and he kept plaintiff "out of work for at least four more weeks and pending reevaluation on his follow-up appointment." (Id.; see also Tr.  699). PA-C Sceppa noted that Dr. Patel saw the plaintiff and agreed with this course of care. (Tr. 550).

On September 4, 2012, plaintiff underwent bilateral L3 transforaminal epidural steroid injections with Dr. Patel. (Tr. 595-96, 672-73). Three days later, on September 7, 2012, plaintiff returned to Dr. Patel at which time he reported "no significant effect" from his September 4, 2012 injection. (Tr. 548).  He had continued back pain; Dr. Patel discontinued one Percocet prescription at this time in exchange for Norco. (Id.). Dr. Patel also held plaintiff out of work. (Tr. 698).

On October 5, 2012, plaintiff returned to Dr. Patel and reported "two and a half to three weeks of relief post [bilateral L3 transforaminal epidural steroid injection] procedure[,]" although his condition had "regressed" since that time.  (Tr. 547).  Dr. Patel and plaintiff decided to pursue another injection, and Dr. Patel continued prescribing two doses of Percocet as his pain management program. (Id.). On October 23, 2012, plaintiff underwent bilateral L4 transforaminal epidural steroid injections with Dr. Patel. (Tr. 593-94, 674-75).

On November 5, 2012, plaintiff reported to Dr. Patel that he had "minimal improvement" following this injection. (Tr. 546).   He also reported back and bilateral leg

pain. (Id.).  On exam, Dr. Patel noted that plaintiff's lumbar spine range of motion flexion was limited to forty degrees, and upon extension and lateral rotation he had pain bilaterally, and reflexes of "1+/4 at the bilateral patellae and Achilles tendon." (Id.).  Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait, and was otherwise neurologically intact.  (Id.).  Dr. Patel reiterated previous diagnoses and continued plaintiff's two-dose Percocet treatment, he started a trial of Gralise, and he had Ambien renewed. (Id.).   Plaintiff was seen a month later with reports of  continued back pain, some increased sleep with Gralise, and feelings of excessive tiredness in the morning. (Tr. 693, 709).  Dr. Patel suggested his patient cut back on Gralise and he continued his two dose Percocet medication program. (Id.).

On January 7, 2013, plaintiff was seen by Dr. Patel once again. (Tr. 692, 708).  He reported continued pain and no improvement overall, and no relief from the Gralise medication. (Id.).  Dr. Patel ordered plaintiff to discontinue Gralise and continued his bi-Percocet medication program and Ambien. (Id.).   A month later, on February 5, 2013, plaintiff returned to Dr. Patel with complaints of back pain and bilateral leg pain, as well as difficulty sleeping due to pain. (Tr. 691, 707; see also Tr. 720-22).  On exam, Dr. Patel noted lumbar spine range of motion flexion limited to forty degrees with bilateral painful extension and lateral rotation as well as reflexes of "1+/4 at the bilateral patellae and Achilles tendon." (Tr. 691, 707).  Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait, and was otherwise neurologically intact. (Id.). Dr. Patel discussed treatment options with plaintiff, and the pair decided to pursue a L3 level transforaminal epidural steroid injection. (Id.).   Dr. Patel also continued his bi-Percocet and Ambien regimen. (Id.).

On March 5, 2013, plaintiff was seen by Dr. Patel's APRN, Hannah Huskic. (Tr. 689-90, 705-06). Plaintiff "continue[d] to complain of back pain and bilateral leg pain which [was] making it difficult for him to sleep at night." (Tr. 689). Plaintiff also reported that his regime of two doses of Percocet regimen "does help alleviate his pain[,]" but that he also stopped Lorzone due to ineffectiveness. (Id.).   APRN Huskic  recommended continued bi-Percocet use and Ambien, she discussed a home exercise program, and she noted Dr. Patel's agreement with her strategies. (Tr. 689-90, 705-06).

On March  12, 2013, plaintiff underwent bilateral L4 transforaminal epidural steroid injections by Dr. Patel. (Tr. 684-85, 696-97, 712-13).  On April 4, 2013, plaintiff returned to Dr. Patel with reports of improvement of "about a week and a half[]" from the previous month's steroid injection. (Tr. 688, 704).   Plaintiff also noted continued limitations and feelings of frustration with his symptoms, with about ten to twenty percent improvement. (Id.). On exam, Dr. Patel noted the following as positive symptoms: lumbar spine range of motion flexion limited to forty degrees; bilateral painful extension and lateral rotation; and reflexes of "1+/4 at the bilateral patellae and Achilles tendon." (Tr. 688). Plaintiff had full strength in the lower extremities, a negative straight leg raise test, an intact gait, and was otherwise neurologically intact. (Id.) Dr. Patel reiterated previous diagnoses and discussed a home exercise program. (Id.).  He also renewed Percocet and Ambien prescriptions. (Id.).

On May 6, 2013, plaintiff was seen by APRN Huskic. (Tr. 687, 703). Plaintiff "continue[d] to complain of back pain and bilateral leg pain[,]" reporting also that "Percocet only provides mild relief [of] his symptoms and is not as effective in relieving his symptoms." (Id.).  On exam, APRN Huskic noted the same findings as Dr. Patel noted the month prior. (Id.).  APRN Huskic reiterated plaintiff's  previous diagnoses and started plaintiff on a trial

of MS Contin and morphine sulfate IR in lieu of his regime of two prescriptions of Percocet. (Id.).  APRN Huskic discussed a home exercise program, and she noted that Dr. Patel agreed with the strategies. (Id.).

On May 14, 2013, plaintiff was treated at St. Mary's Hospital for neck and back pain following a motor vehicle accident.  (Tr. 676-78).  Plaintiff had full strength in his extremities, had intact reflexes, had a decreased range of motion in the back, and had pain to palpation in the lower back. (Tr. 676).  He was ultimately diagnosed with a cervical and lumbar strain. (Id.).   X-rays of plaintiff's cervical spine showed no fractures and "[m]ild degenerative changes" at C5-C6 and C6-C7 with anterior osteophytes and "mild narrowing of the disc spaces." (Tr. 679).  X-rays of plaintiff's lumbar spine showed degenerative changes, "most marked at L4-L5 with interval increasing degeneration compared to the CT of 07/22/2005[,]" as well as his fusion material. (Tr.  680).

Plaintiff returned to Dr. Patel on June 7, 2013. (Tr.  686, 702; see also Tr. 717-18). Plaintiff reported little relief from his MS Contin and MSIR medication regimen; Dr. Patel switched plaintiff back to his bi-Percocet regimen. (Tr. 686, 702).  Dr. Patel diagnosed plaintiff with mechanical back pain, history of lumbar fusion, and bilateral L3-L4 radiculitis. (Id.).

On July 9, 2013, plaintiff returned to APRN Huskic with continued complaints of persistent back pain and bilateral leg pain, and with reports that his pain management regimen was "no longer effective" in relieving his symptoms. (Tr. 695, 711). On exam, APRN Huskic noted that plaintiff's lumbar spine range of motion flexion was limited to forty degrees with bilateral painful extension and lateral rotation as well as reflexes of "1+/4 at the bilateral patellae and Achilles tendon[;]" and plaintiff continued to have full strength in the lower

extremities, a negative straight leg raise test, an intact gait, and was otherwise neurologically intact. (Id.).  APRN Huskic suggested a new medication, Exalgo, that would be prescribed at the next visit, and she continued his bi-Percocet regimen. (Id.).  APRN Huskic noted Dr. Patel's agreement with her treatment plan. (Id.).

On July 15, 2013, plaintiff returned to APRN Huskic with continued complaints of persistent back pain and bilateral leg pain; he reported that his pain management regimen was "minimally effective[.]" (Tr. 694, 710).  On exam, APRN Huskic's findings were the same as previously noted.  (Id.).  APRN Huskic prescribed Exalgo for a trial medication, and she noted Dr. Patel's agreement with her treatment plan.  (Id.).

## 2. SHOULDER

Plaintiff complained of left shoulder pain in 2009-10 to his primary care physician (Tr. 355-58), and on April 12, 2010, plaintiff reported his pain had "resolved." (Tr. 355).  A year later, on May 25, 2011, plaintiff presented to St. Mary's Hospital in Waterbury, Connecticut with complaints of "excruciating" left shoulder pain of three weeks' duration. (Tr. 350; see Tr. 351).[10]  Plaintiff's arm was cradled in a sling, and upon examination, he exhibited a limited range of motion secondary to pain, as well as guarding of the area. (Tr. 350).  He was diagnosed with left shoulder pain and prescribed Dilaudid and Naproxen. (Id.).  X-rays did not identify any fracture. (Tr. 351).

Plaintiff had also seen his primary care provider, Dr. Barchini, on this same date for the same issues. (Tr. 370-73, 387-89).  Dr. Barchini reported that plaintiff was unable to lift his left arm due to pain and tenderness and had limited range of motion of the cervical spine. (Tr. 373, 389).  Plaintiff had intact bilateral hand grip strength and normal reflexes in the

---

[10]Plaintiff reported that he was in a car accident approximately a month prior.  (See Tr. 371).

upper extremities. (Id.).

Plaintiff was seen by an orthopedist, Dr. T. Michelle Mariani, on May 26, 2011 for an evaluation of his left shoulder. (Tr. 413-14, 415-16).  At the time, plaintiff complained of "very severe pain with any motion[]" and an inability to sleep comfortably. (Tr. 413, 415). On exam, Dr. Mariani found her patient in mild distress and with a left shoulder "demonstrat[ing] significant tenderness and soft tissue swelling[.]" (Tr. 414, 416).  Plaintiff had "very poor tolerance to any motion in the left shoulder." (Id.). Dr. Mariani prescribed Oxycodone ("as he has a tolerance to Percocet from long term chronic use[]"), ordered continued use of Naproxen, and ordered laboratory studies and an MRI of his left shoulder. (Id.).

Dr. Mariani diagnosed plaintiff with a left partial subscapularis tear on June 2, 2011. (Tr. 407, 412, 417).  An MRI read by Dr. Mariani showed "significant inflammation in the anterior aspect of the shoulder, partial subscapularis tear[]" as well as "significant edema within the anterior deltoid[.]" (Id.) On physical exam, Dr. Mariani examined his range of motion and noted "tenderness anteriorly over the proximal biceps and subscapularis region, pain with Speeds testing, pain with abduction and external rotation, [and] minimal pain with impingement testing[.]" (Id.). She further saw "some discomfort and mild weakness with bear hug testing." (Id.). Plaintiff was neurovascularly intact. (Id.) Dr. Mariani recommended anti-inflammatory medications and physical therapy, and she noted that plaintiff "may need a surgical intervention" should these modalities fail. (Id.).

On July 7, 2011, plaintiff, after undergoing five sessions of physical therapy, returned to Dr. Mariani who noted "minimal improvement" such that she opined that plaintiff will "likely . . . need surgical intervention." (Tr. 407-08).  On exam, Dr. Mariani noted plaintiff's

discomfort with range of motion; tenderness in the shoulder, biceps, AC joint, and subscapularis regions; pain with crossover adduction; pain and mild weakness with bear hug testing; discomfort with liftoff and belly press; 4+/5 strength; and pain with abduction, external rotation, and impingement testing. (Tr. 408). Dr. Mariani reviewed the previous MRI and found plaintiff's symptoms "consistent with a partial subscapularis tear with some involvement of his biceps tendon." (Id.).

### C. MEDICAL OPINIONS

On November 4, 2011, Dr. Maria Lorenzo, a State agency medical consultant, opined that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability. (Tr. 81-83). Dr. Lorenzo also reported that plaintiff could occasionally climb ramps/stairs, never climb ladders or ropes, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 82). Additionally, plaintiff was limited to occasional reaching overhead with his left arm. (Id.). Seven days later, on November 11, 2011, Dr. Louis Chelton agreed that plaintiff has exertional, postural, manipulative, and environmental limitations. (Tr. 483-84).

On March 29, 2012, Dr. Nathaniel Kaplan, a State agency medical consultant, reviewed the evidence of record and opined that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability. (Tr. 91-93).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal

principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.   See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

## IV.  DISCUSSION

Following the five step evaluation process,[11] ALJ Thomas found that plaintiff has not

---

[11]Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.150(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is

engaged in substantial gainful activity since September 1, 2009, the alleged onset date.  (Tr. 13, citing 20 C.F.R. § 404.1571 et seq.).  ALJ Thomas then concluded that plaintiff has the following severe impairments: degenerative disc disease, and shoulder dysfunction status post tear (Tr. 13-14, citing 20 C.F.R. § 404.1520(c)), but that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14-15, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  In addition, at step four, "[a]fter careful consideration of the entire record," ALJ Thomas found that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except that: he is able to perform occasional climbing of ramps and stairs; he cannot climb ropes, ladders, and scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; and, he is able to perform occasional reaching above shoulder height with his left upper extremity.  (Tr. 15-19).  The ALJ concluded that plaintiff is unable to perform any of his past relevant work (Tr. 19, citing 20 C.F.R. § 404.1565), but there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 19-20, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)).  Accordingly, the ALJ concluded that plaintiff has not been under a disability from September 1, 2009 through the date of his decision.  (Tr. 20, citing 20 C.F.R. § 404.1520(g)).

---

automatically considered disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows that he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows that he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ's residual functional capacity ["RFC"] finding is not supported by substantial evidence (Dkt. #14, Brief at 2, 3-14); and had the ALJ assigned an RFC "reflective of the evidence in the record, the outcome of the plaintiff's claim would have been favorable, at least partially, to plaintiff." (Id. at 2, 15).

Defendant counters that plaintiff failed to meet his burden of establishing his RFC (Dkt. #19, Brief at 3); the ALJ properly afford great weight to the opinions of the State agency medical consultants, and less weight to plaintiff's treating providers opinions (id. at 4-5); the ALJ properly addressed Dr. Patel's opinion (id. at 6); the ALJ correctly concluded that plaintiff's subjective complaints were not entirely credible (id. at 7-9); and the ALJ properly relied upon Medical-Vocational Rules at Step Five of the sequential evaluation (id. at 9-10).

### A. ALJ'S RFC ASSESSMENT

The ALJ found that plaintiff retains the RFC to perform "light work as defined in 20 [C.F.R. §] 404.1567(b) except" that plaintiff is "able to perform occasional climbing of ramps and stairs, no climbing of ropes[,] ladders and scaffolds, [and can] occasionally balance, stoop, kneel, crouch, and crawl." (Tr. 15). Additionally, ALJ Thomas concluded that plaintiff is "able to perform occasional reaching above shoulder height with the left upper extremity." (Id.). In reaching his conclusion, the ALJ considered the opinions of Drs. Patel and Karnasiewicz before assigning such opinions "[l]ittle weight[.]" (Tr. 18-19). He also considered the opinions of non-examining State agency physicians, Drs. Lorenzo and Kaplan, before assigning such opinions "great weight[,]" finding that such opinions "were both consistent with [the ALJ's] findings regarding [RFC], and . . . were consistent with the medical evidence of record." (Tr. 18).

28

Plaintiff contends that the ALJ erred in his consideration of the opinions of record as his determination regarding plaintiff's treating physicians does not comply with SSA regulations and the related law, and is not supported by substantial evidence (Dkt. #14, Brief at 4-11), and the ALJ's RFC finding was not supported by either medical or non-medical evidence of the record. (Id. at 11-15). Defendant counters that the ALJ complied with the treating physician rule and properly determined plaintiff's RFC based on the medical evidence of record. (Dkt. #19, Brief at 3-7).

"'The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]'" Burgess, 537 F.3d at 128, quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted). Generally, "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by the medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013), citing Burgess, 537 F.3d at 128 (opinion of treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record)(additional citations omitted); see also 20 C.F.R. § 404.1527(c)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight."); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted). Under the treating physician rule, an ALJ assigns weight to a treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(c)(2)(formerly 20 C.F.R. § 404.1527(d)(2)).

In a case such as this, where the ALJ does not assign controlling weight to treating physician opinions, the ALJ must "explicitly consider" the foregoing factors. Selian, 708 F.3d at 418 ("In order to override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing factors.). Then, "[a]fter considering the above factors, the ALJ must 'comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.'" Burgess, 537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(d)(2)(stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion")(emphasis added).

In his decision, ALJ Thomas concluded that "[l]ittle weight" was afforded to the opinions of Dr. Karnasiewicz because his opinion in 2012 that plaintiff was "'permanently disabled' from his prior job and probably had a sedentary work capacity," was "not consistent" with his opinion, three years prior, in 2009 that plaintiff was able to return to work, and in 2010 that plaintiff was "again totally temporarily disabled[,]" "nor are they consistent with the most recent treatment notes which demonstrate an improvement" in plaintiff's symptoms. (Tr. 18). The ALJ then discussed Dr. Patel's notes, finding that such records revealed that plaintiff was "conservatively treated from 2012-2013," had improvement after injections, and in 2012, noted that plaintiff was able to ambulate around

the room, was in mild distress, and had a nonantalgic gait.  (Tr. 18-19).  Based on these

entries, the ALJ concluded that "these opinions were afforded little weight."  (Tr. 19).[12]

In contrast, the ALJ assigned "great weight to the opinions of the DDS non-examining

physicians[,]" after discussing their functional assessments of plaintiff.  (Tr. 18).[13]  According

to the ALJ, the opinions of Drs. Lorenzo and Kaplan "were both consistent with [the ALJ's]

findings regarding [RFC], and as such, were consistent with the medical evidence of record."

(Id.).  There are no functional assessments completed by plaintiff's treating providers; thus,

the treating providers' underlying records offer the only insight into the treating providers'

opinions as to plaintiff's RFC.  Accordingly, and particularly in a case such as this, the ALJ's

consideration of those records is paramount.

---

[12]It is not clear if the ALJ's reference to "these opinions" was to Dr. Karasiewicz's opinions, Dr. Patel's opinions, or both.  (Tr. 18).

[13]As discussed above, on November 4, 2011, Dr. Lorenzo opined that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability. (Tr. 81-83).  Dr. Lorenzo also reported that plaintiff could occasionally climb ramps/stairs, never climb ladders or ropes, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 82).  On March 29, 2012, Dr. Kaplan opined that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability. (Tr. 91-93).

"Light work" is defined as lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and sitting most of the time but with some pushing and pulling.  Social Security Ruling ["SSR"] 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). Specifically, as defined in the Regulations:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . . .

20 C.F.R. § 404.1567(b).

31

Plaintiff has been under the care of Dr. Karnasiewicz since 2001, and he performed two surgeries on plaintiff's back -- in 2001 and 2005.  (See Tr. 654-62).  The ALJ did not consider the longevity of this treatment relationship, nor did he acknowledge Dr. Karnasiewicz's speciality, which is of particular importance given that plaintiff claims he is disabled due to his back impairment.  See Selian, 708 F.3d at 418; Halloran, 362 F.3d at 32, citing 20 C.F.R. § 404.1527(c)(2).  See also Ortiz v. Colvin, Civ. No. 3:15 CV 956 (SALM), 2016 WL 4005605, at *5-6 (D. Conn. July 26, 2016)(ALJ's failure to address either the nature or length of treating physician's treating relationship, or his specialty, "precludes a determination that the ALJ's conclusions were supported by substantial evidence.").  Plaintiff returned for treatment from Dr. Karnasiewcz in 2008 after complaining of "severe" back and lower extremity pain; plaintiff's range of motion in his back was "significantly restricted."  (Tr. 530-31).  He was ordered to stay out of work until the issue resolved.  (Tr. 531).  In May 2009, Dr. Karnasiewicz noted that plaintiff walked "slowly and stiffly[,]" his range of motion was restricted, and he found plaintiff totally temporarily disabled, but by July 2009, he was cleared to return to work without restrictions. (Tr. 519).  However, in November 2009, Dr. Karnasiewicz's PA noted that plaintiff's "severe back pain[]" left him "unable to sit[,]" and plaintiff was in "extreme distress." (Tr. 349, 521, 533).  He had SI joint tenderness,"severely limited[]" range of motion in the back and an altered gait.  (Id.).  In November 2009, Dr. Karnasiewicz noted that plaintiff was in "terrible pain[,]" and even "slight range of motion cause[d] severe back pain." (Tr. 521-22, 533).  In December 2009, January 2010, and July 2010, Dr. Karnasiewicz noted that plaintiff was "not doing well[,]" but that plaintiff wished to avoid another surgery.  (Tr. 522-23, 535-36).  Dr. Karnasiewicz noted that plaintiff described transient relief from epidural steroid injections, and plaintiff "walk[ed] with great difficulty."  (Tr. 523, 526).

Plaintiff began treating with Dr. Patel in September 2010; at his initial visit, Dr. Patel noted, consistent with Dr. Karnasiewicz, that plaintiff's back pain was made worse by, inter alia, prolonged sitting, standing, walking, rising from sitting, and bending forward or backward.   (Tr. 591).[14]    Dr. Patel noted a slow antalgic gait, and, just as he noted consistently over the next years, restricted lumbar range of motion to forty degrees and diminished reflexes.   (Id.).  Dr. Patel treated plaintiff on a monthly basis for nearly three years, yet there is no mention of either the duration or frequency of Dr. Patel's treatment of plaintiff in the ALJ's decision. (Tr. 18-19); see Selian, 708 F.3d at 418; see also Ortiz, 2016 WL 4005605, at *5-6.

Moreover, plaintiff's treatment from Dr. Patel is not correctly reflected in the ALJ's decision. Three years of treatment records show that plaintiff received several bilateral L4-L5 transforminal epidural steroid injections from Dr. Patel. (See Tr.  511-12, 514, 593-603, 670-75, 684-85, 696-97, 712-13).   The ALJ relies upon plaintiff's reported improvement after these injections, but a closer review of the records reveals that plaintiff's pain was "somewhat improved" (Tr. 509, 584); he had some improvement of his back pain (fifteen to twenty percent), although he still experienced back pain that radiated into his lower extremities (Tr. 418-19, 503-04, 578-79); he had "slight improvement," "maybe [fifteen percent], overall[,]" (Tr. 410, 501, 576); and he reported "approximately [ten] to [twenty percent] improvement[.]"[15] (Tr. 549).   All the while, the same records, and dozens of additional records from Dr. Patel and Dr. Karnasiewicz reflect that even with plaintiff's

---

[14]As stated above, see note 13 supra, light work, which the ALJ found plaintiff capable of performing, involves either a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

[15]Even with this "slight improvement," plaintiff remained out of work per his doctor's orders.  (See, e.g., Tr. 410, 501, 576).

medication regime and epidural injections, plaintiff was living in pain, which was increasing over time (see Tr. 398, 495, 570 (felt pain was worse); Tr. 400, 497, 572 (pain); Tr. 418, 503, 578 (radiating pain); Tr. 554 (pain unrelieved by medication); Tr. 547 (condition "regressed[]"); Tr. 687, 703 (medication provides "mild relief . . . and is not as effective"); Tr. 692, 708 (continued pain and no improvement overall); Tr. 694, 710 (pain management regime was "minimally effective"); Tr. 695, 711 (pain management regimen was "no longer effective")).  In addition, he had difficulty getting on and off the examining table (Tr. 425, 505, 581); he was described as "ambulat[ing] with a limp and [losing] his balance with ambulation[]" (Tr. 517, 537); and his pain increased with walking, standing, or sitting too long.  (Tr. 403, 410, 501, 576; Tr. 515, 539 (low back pain that radiated into the right proximal buttock that was aggravated by sitting, standing, or walking)).

In August 2010, Dr. Karnasiewicz referred plaintiff to Dr. Taylor who also found plaintiff "uncomfortable as he move[d] about the examining room[]" with limited range of motion due to pain.  (Tr. 464).  He concurred with Dr. Karnasiewicz that a fusion surgery would be reasonable but he acknowledged that such surgery may not resolve all of plaintiff's pain. (Tr. 465).  Notably, Dr. Taylor referenced plaintiff's report of "a degree[]" of help from the three epidural steroid injections, but he added that overall plaintiff had continued back pain that was "excruciating[]" from time to time, and that radiated into the right buttock. (Tr. 464). Similarly, plaintiff was referred to Dr. Mashia in 2011, who, consistent with the findings of Drs. Karnasiewicz and Patel, noted plaintiff's "unrelenting pain and stiffness across the lower back[]" that "radiat[ed] into both lower extremities[]" and that was "bothered by any prolonged standing, sitting, or repetitive bending."  (Tr. 403).  Additionally, upon exam, Dr. Mashia noted "clear[]" discomfort at rest, a "slow and cautious gait[,]" lumbar flexion limited to twenty degrees and extension to ten degrees due to pain and spasm, limited lateral

movements to fifteen degrees, diffuse muscle guarding and spasms in the lower back, and palpation tenderness. (Tr. 402). The consistency of these opinions with the findings and opinions of plaintiff's treating providers similarly is not discussed by the ALJ. (Tr. 18-19); see Selian, 708 F.3d 418.[16]

Additionally, the diagnostic testing[17] is consistent with the treating providers' records that the ALJ ignored when discussing the weight he assigned to their opinions. Moreover, in his decision, the ALJ did not address such testing, which supports Dr. Karnasiewicz's and Dr. Patel's findings, when he assessed the weight to assign to their opinions. See id.

Thus, even if the ALJ is not required to "explicitly address each of the Selian factors in his decision," in this case, it is not "'clear from the decision that the proper analysis was undertaken.'" Lumpkin v. Colvin, No. 12 CV 1817(DJS), 2014 WL 4065651, at *8 (D. Conn. Aug. 13, 2014), quoting Khan v. Astrue, No. 11-CV-5118(MKB), 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013). In this case, just as in Lumpkin, "[t]here is no indication in the ALJ's decision that the factors identified in Selian were explicitly considered[,]" and thus remand is appropriate. Id.; see also Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004)("A reasonable basis for doubt that the ALJ applied the correct legal standard in determining the weight to afford the treating physician can be grounds for remand.")(citation omitted).

___

[16]Additionally, when plaintiff was treated at St. Mary's Hospital in May 2013 following a car accident, it was noted that he had a decreased range of motion in his back, and pain to palpation in the lower back. (Tr. 676).

[17]As discussed above, an MRI taken on November 9, 2009 revealed "[s]tatus post posterolateral and anterior fusion at L5-S1" with "mild right neural foraminal narrowing at this level[]"; "L4-L5 spondylosis with slightly increased moderate central canal narrowing" with "moderate left greater than right neural foraminal narrowing at this level[]"; and "[m]ild progression in mixed intensity endplate signal changes at L4-L5, with mild associated enhancement, probably degenerative/reactive rather than infectious." (Tr. 524-25, 541-42).

Additionally, while an ALJ may rely on the opinions of State agency consultants as they are "are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation[,]"  20 C.F.R. § 404.1527(e)(2)(i), such reliance is proper when the consultant's opinions are supported by other facts in the record, and they provide substantial evidence for the ALJ's findings.  See 20 C.F.R. § 404.1527(e)(2)(ii).  In this case, the ALJ's reliance on the non-examining State agency physicians' RFC assessments, and his assignment of "great weight" thereto, is not supported by substantial evidence.  While the ALJ states in his decision that their assessments were "consistent with the medical evidence of record[,]" a review of the medical records, as discussed above, fails to support that conclusion. (Tr. 18).  Moreover, the ALJ's statement that, "[w]hile these doctors were not able to treat the claimant, they had the opportunity to review much of the evidence in the file[,]" is not supported by the record.   In their records of analyses, Drs. Lorenzo and Kaplan recite review of a very limited number of records.  (See Tr. 79-80, 90-91).  Dr. Lorenzo recites review of Dr. Karnasiewicz's clearance of plaintiff to return to work with no restrictions, and his records from July 2009, November 2009 (which reflects "extream [sic] distress, unable to sit"), and June 2011; plaintiff's November 2009 MRI; Dr. Barchini's records; and one 2011 record from Dr. Patel.  (Tr. 79-80).  Dr. Kaplan recites review of one record from Dr. Patel's office, dated February 13, 2012; records of four nerve blocks, administered in 2011 only; and one record from Dr. Karnasiewicz's office from July 14, 2011, which does indicate "ROM is markedly restricted . . . ." (Tr. 90-91).  Yet, the ALJ reaches the unsupported conclusion that the State agency opinions override the opinions of the treating physician opinions because they are consistent with the medical record.

Additionally, the ALJ's reliance on some entries from the medical record, as discussed herein and above, while ignoring most other records, is troubling.  The ALJ cannot cherry

pick the medical source opinions and the treatment records to support his RFC determination.  See Rodriguez v. Colvin, No. 13 CV 1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016); see also Sutherland, 322 F. Supp. 2d at 289 ("It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim.")(multiple citations omitted).   Remand is appropriate in this case as the ALJ erred in his treatment of the medical opinions and records, and such error, coupled with a blatant disregard for records that detracted from his ultimate conclusion, resulted in the determination of a RFC that is not supported by the record before the ALJ.

> ### B. REMAINING ARGUMENTS

For the reasons explained above, the parties  remaining arguments about the ALJ's credibility assessment and Step Five determination (see Dkt. #14, Brief at 12-15; Dkt. #19, Brief at 7-10) will, by necessity, be addressed by the ALJ on remand.

## V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #14) is granted such that the matter is remanded for further proceedings consistent with this Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #19) is denied.

Dated at New Haven, Connecticut, this 23rd day of February 2017.


 /s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge